Thank you, Your Honor, and I would like to reserve a few minutes in the interest of rebuttal. That said, we brought this case asking the court three questions. The first question being the reasonableness standard under Gorman and the district court's interpretation of what it means to reasonably believe that an individual is in his home. The court in this case indicated that the reasonable belief standard, and looking to the record at excerpt 76 on page 146, indicated that absence of some information from the officers to believe that the defendant is not home at the time should be sufficient to satisfy probable cause slash reason to believe. We believe that's an error. We believe that the Gorman court indicated the proposition that there needs to be something else, that there needs to be some indication that the defendant is indeed home. There needs to be some additional indica that … Well, can't somebody's customary practice itself provide the basis for a reason to believe? I believe the Gorman court indicated, Your Honor, that the probable cause standard and the reasonableness associated with probable cause needs to give something higher. And I think the Gorman court or, you know, I know the Gorman court indicated that, that the reasonableness that is associated with probable cause is now associated with the reasonableness or reason to believe the individual is present in his home. It's your submission that there has to be specific evidence, a sighting, or some other direct evidence of Diaz being home? That's our reading, Your Honor. Now, where do you get that from? Not Gorman. It just says reason to believe. It doesn't say direct evidence of or circumstantial evidence of, right? Well, even looking to the Gorman case itself, there was additional indication that I believe it was Kenneth Gorman was present at that location. Also, other cases, even the government cited, I believe it was Terry in an 11th Circuit case where there was even an additional third party, whether it be a CI indicating that the officers, indicating to the officers that the individual was present at the home, or I believe it was the Terry case where officers approached the little boy that had Terry written on his back and the small child indicated mom and dad are upstairs in the apartment. So, Your Honor, I think that there does need to be something additional to give the officers the ability to enter one's home or address. And that something additional is specific direct evidence that the individual is at his home in the sense of hearing his voice, seeing his body, or having somebody point out that he is there at that time. Yes, Your Honor. You don't get that from Gorman. You imply that from Gorman. I do imply that from Gorman. Is there a case that says exactly what I've put in your mouth? There isn't, Your Honor. And I wish there were, and hopefully this is the case. But nevertheless, Your Honor. Let me give you, if we might be that case, let me give you a hypothetical. Drawing from some real facts, so that's nothing new. Yes, Your Honor. I have a cottage behind my house and I had a guy living there for a while who basically was there like 24 hours a day. He almost never left. His avocations included surfing the web and day trading, and he didn't have another job. And so you could pretty much guarantee any time he's there. Suppose the authorities have information like that. Doesn't that give them pretty good reason to believe that he's going to be there at an ordinary time when they go to arrest him? And can the fact that he hadn't been seen all day because he never left the place suggest that that's too tough a burden to expect them to have independent affirmative evidence that somebody is present? In that case, Your Honor, where the individual does not leave, there may be enough justification. There may be enough to, I guess, give the officer's probable cause and reasonable belief that he is there if he's there all the time. I start with that deliberately extreme example because it seems to me that there can't be just a yes, no, or absolute requirement for specific affirmative evidence. This is simply one factor thrown into the mix of everything else in order to reach a conclusion whether or not there is reason to believe. And one of the factors that may fairly be considered is someone's customary practice. Definitely, Your Honor. And looking for this individual, the officers did go by that house on several occasions, and one of the officers testified that half of the time he was there and half of the time he wasn't there. One of the other officers testified it was a little bit more frequent. I believe it was four out of five times. So I guess 20% of the time he wouldn't have been there, or one out of the five times. Counsel, what do you do with this answer? Officer Teton asked him on a prior occasion the best way to contact him, and he said by mail, quote, or just by, he's always home. Stop by his residence. That's a D.R. 43. So D.R. says, I'm always home. Stop by my residence. You want to contact me. He was cooperating with the police at a certain point, so that's what he said. Isn't that pretty good circumstantial evidence? I know circumstantial evidence isn't direct evidence, but Henry Thoreau said when you find a trout in a milk bottle, it's only circumstantial evidence that someone put it there, but that's pretty good circumstantial evidence, right? Isn't that pretty good circumstantial evidence? And looking to, I guess, that response from Mr. Diaz, and that was in response to when the officers could contact him for additional investigation. And, you know, Mr. Diaz in that response was being very cooperative. This was an individual that had a, when officers did visit, he was very open to letting them in the house or letting them on the property, whatever. But nevertheless, and, again, looking to the facts, and I guess specifically looking to the fact that we have indication where Mr. Diaz actually may not have been present. Now, I'm indicating or looking to the fact that the vehicle in which they spotted in the surveillance actually drove away. Whether or not there was one person in the car or two people in the car, I don't think is important. What is important is that there was an individual in the car, and that individual wasn't identified. So we have an issue here where it seems as though officers could have taken some steps to at least identify who was in that vehicle. Because in the case that day, it looks as though there's a presumption that maybe Mr. Diaz actually left the residence. I don't know how you get a presumption of that, though, on this record, because cars came in. It was not unusual for cars to come and go from that residence, was it? No, Your Honor. A car left, and a car did leave. The record shows that a car did leave. But how would that raise any presumption? Because it could have been Mr. Diaz. It could have been, but it could have been anybody else. That's the thing. It didn't necessarily point to Mr. Diaz. Turning this on its head, Your Honor, I guess I don't see it unreasonable to check to see whether or not, especially when you have an arrest warrant. You mean stop him? Possibly. Or at least look to see whether or not that was Mr. Diaz. Let me redefine your question, because the standard we're dealing with is not whether it's reasonable to do something else. It's whether it's unreasonable to believe in this case or whether there was reason to believe that he was there. And the reasonable line is not a black-white. There's only one reasonable response. By definition, reasonable can cover a variety. So in this case, it isn't so much whether it might have been reasonable to stop the person driving away to make sure that it was Mr. Diaz who was still left at the house, in case there was only one person in the vehicle. We don't know even that. The possibility is that there could have been two. But we still go back to the question, was there reason to believe that he was there? And the fact that a car drove away or was driven away is simply one more fact to be tossed into the hopper. If this were a place where nobody ever visited, then the spotting of a car driving away would lead reasonably to a conclusion nobody was there. But if it's a place where there are people that come and go, and as Judge Ferris observed, that's the situation here, it's a factor, but only one factor to put into the mix. And I'm not sure I understand why it's a factor that carries such weight. If you know in the past, cars have been driven away, and yet there's still somebody, Mr. Diaz is still back there. I'm not saying that that is the factor that should turn this case. I'm just saying that looking at how little evidence that they had regarding whether or not Mr. Diaz was present that day in the home, coupled with the fact that a vehicle leaves with an individual whom they don't identify, I think that goes to scale towards an unreasonable search into Mr. Diaz's residence. That said, Your Honor, I'd like to move on to the second issue, because that is also an issue that we had a great concern about. And that was our Sixth Amendment right to call a witness versus that witness's Fifth Amendment right not to self-incriminate himself. Now, looking to the procedural history, and I think that's particularly relevant in this case, where in the very early going, and I think the record shows this, we attempted to get a lawyer for Ms. Diaz. We knew that this was going to be a crucial witness for the defense case and for the defense theory, that being that Ms. Diaz was the actual owner. She was the one that found the weapon. She was the one that proclaimed that she owned the weapon when the officers found it in that back bedroom. That said, she was of high importance to our case. So we did some investigation and learned that she had a felon. That said, Mr. Diaz was very concerned that his wife would be subject to criminal prosecution herself. And I was concerned about this Fifth Amendment issue if she did, in fact, take the stand. So we wanted to resolve that at a very early moment in this trial. So we filed our memoranda, and the court has that in the record. And then the court declined to appoint Ms. Diaz counsel. The court cited the fact that she had yet to be indicted, that the government had yet to charge her criminally with being a felon in possession. So that said, no pre-indictment appointment would be warranted at that point.  And with full intention that we would be able to call Ms. Diaz when we wanted to. But with intention as well that she did have a Fifth Amendment right. And it's hard not to anticipate the likelihood of somebody asserting a Fifth Amendment right if they are advised to go up in the stand and say that you've effectively pled guilty to felon in possession. No doubt, Your Honor. And we did envision that. And that's why I thought it appropriate to approach court staff, which I'd already done, I suppose, in my memoranda, but give them one additional warning that I'm not sure if this individual will indeed take the Fifth Amendment, but there's a possibility. I'm not sure if the court will warn her of the pitfall or somebody else, or if she's retained counsel, which I wasn't aware of, and she hadn't yet. But I just wanted to make sure that the court was aware rather than springing something in the middle of trial. That said, the court asked that I call a few other witnesses first, which I did. And then the court appointed Mr. Carter, a CJA panel lawyer. This, in turn, prevented me from calling Ms. Diaz. At that point, Ms. Diaz was not going to be available. Mr. Carter, who had just recently been on the case for a few minutes, was not going to allow us to get into anything. We could have got out maybe her name and where she lived. But other than that, he was very reluctant to allow me to go into anything, which I suppose under the situation might be called for. I would probably counsel her the same. Nevertheless, the court put that onus upon the defense, and I think that's an error. What onus? What is an error? No, what's the onus? I mean, it seems to me what you're telling us is exactly what you anticipated happened. So what's the problem? Most definitely. Well, we anticipated being able to call her. We did not anticipate the court at the time that we were going to call her to appoint counsel. This had highly prejudicial nature upon the defense. Now our theory went out the door, and we could not call her as a witness. She was unavailable at that time. And going to that unavailability, Your Honor, the case law suggests that to be deemed unavailable, the court should have a hearing and make sure that that witness is indeed going to assert the Fifth Amendment and whether or not that Fifth Amendment assertion is valid. Yeah. I'm really confused here because it seems to me, I mean, frankly, I can tell you had thought this out in advance. You identified the problem. You brought it to the court's attention. Now, all of that is both commendable in terms of relationship with the court and, I think, astute given these circumstances. But under those circumstances, it can't be the case that you were caught by surprise that the Fifth Amendment might be asserted by this witness. It was pretty obvious that that would be coming. And as you say, you would have given that same counsel yourself. So all the complaint really is is that the court didn't appoint counsel for her in advance so that she was taken off the table at an earlier moment. But I'm not sure where your client has the constitutional right for her to be appointed counsel in advance. She may not have. But she did not have a right to be appointed counsel at that time. And what – But that's not – your client doesn't have a right that she not be appointed counsel at that time. So where's your client got a right that's violated? The issue here becomes the court and – where the court deemed her unavailable because she was going to assert the Fifth Amendment. The court did not know or did not have a hearing to properly determine whether or not that assertion was valid, whether or not she had proper grounds. But a court can bypass a step based on the attorney's representation that the witness will invoke the Fifth. That's clear. Now, the court indicated that to me to go find out from defense counsel what she would testify to. The court has an obligation to at least query that counsel to see where they are going. Is there any doubt that she was going to use the Fifth Amendment? I mean, can you say in good faith that there was any doubt that she was going to claim the Fifth Amendment? Here's a felon. She's going to claim that the gun was hers and step right into 922? I mean – Possibly to some things, Your Honor, but this was a blanket assertion. This was, I'm going to – she will claim the Fifth Amendment. So I was prevented from calling her, possibly asking her other things, and then threatened with contempt if I did choose to ask questions that may invoke her, you know, maybe even prematurely to invoke the Fifth Amendment. I had no ability at that point to call this witness and determine whether or not her assertion – What could you have called her that was relevant to this case that would not have inculpated her? Are you going to ask her where she went to high school? No, Your Honor. I don't know how far along we could have gotten, but in this sense – What you wanted to do was to show the jury somebody else who possessed a gun by taking the Fifth Amendment, by her taking the Fifth Amendment. The judge wouldn't let you do that, and that's exactly what they're holding you clear. Your Honor, in this situation and in the timeframe that this was imposed, gave a great deal of prejudice to the defendant, and that is in error. And looking to the Sixth Amendment and the policy behind allowing us to call a witness and to determine whether or not that witness is truly unavailable should be left to the court, should be left to the district court, not to a defense counsel and a CJA-appointed lawyer who just recently, within minutes, got appointed to a case where he really didn't know the background and was indicating a blanket Fifth Amendment assertion. If you were going to write the bottom line to the disposition and if the court would find something was wrong, what language would you use? I'm sorry, Your Honor. Would you say that a court cannot prevent a client, a defendant, from putting on the witness stand a witness who is going to claim the Fifth Amendment? Has that already been resolved? Yes, Your Honor. The court can and the court should to prevent what Your Honor was concerned about. I know you're saying something's wrong. So what would the court say if we said, all right, we agree with you, something's wrong? What would we do? How would we describe it? The concern is the procedure that the court went about indicating that this witness was unavailable. There was no – there was not a proper determination to make sure that this blanket assertion was valid, and that was our concern, and that's why we brought the appeal. Could you identify to the court what it is you might elicit from this witness that wouldn't provoke an assertion of the Fifth Amendment right? No, I did not, Your Honor. I simply went back with the counsel. The counsel was very concerned about his client, and I was very concerned about the contempt. So I didn't even want to approach the situation, Your Honor. That said, I believe I'm almost out of time. I'll quickly – You're more than out of time, but we'll still give you a couple minutes for rebuttal because, as I predicted, we used it. Okay. Thank you, Your Honor, for that. I'll be back up here shortly. May it please the Court, I'm Alan Burrow, Assistant U.S. Attorney from Boise, Idaho, on behalf of – Did your eyedrops help you? I hope so, Your Honor. Thank you. On the first issue, which is the reason to believe issue with the execution of an arrest warrant, the district court here proceeded very conscientiously, and I would submit to the court that the district court looked exactly where Gorman said to look. The district court focused on the fact that in discussing the probable cause standard, Gorman focused on Professor Lefebvre's statement and his discussion of how the probable cause standard is to be applied under circumstances where the police have a valid arrest warrant and are seeking to execute it at the defendant's residence, not at some other residence, but at the defendant's residence. And the Gorman court quoted Professor Lefebvre and also quoted the Fifth Circuit case with the following language and emphasized the following language. Reasonable belief embodies the same standards of reasonableness as probable cause, but allows the officer who has already been to the magistrate to secure an arrest warrant to determine that the suspect is probably within certain premises without an additional trip to the magistrate and without exigent circumstances. The court here found that these officers had probable cause to believe Mr. Diaz was at his residence under all the facts of this case. You don't dispute what your colleague says. It's a standard articulated by the court that unless there is some evidence that he's not home, we have reason to believe he is home. That's not correct, is it? No, Your Honor, and the court clearly applied the probable cause standard. I think the way the Gorman standard works and the probable cause standard under these circumstances, it's really a matter of what inference the police are allowed to draw from the fact that the building in question is the defendant's residence. That's really the issue. In this particular case, the officers were able to draw a strong inference that he was there because of the past history with this defendant. They had been out there on at least five occasions. He had been there on four of those five occasions. The defendant himself had told the police that that was the best way to get a hold of him, was just to come out there during the day. They knew that the defendant worked out of his home. He was a mechanic, and he worked there. So the question really becomes whether the district court was clearly erroneous in its finding that there were no countervailing factors present at the time which would suggest to the police that the defendant was not at home on this particular occasion. And that then focuses on the individual or individuals leaving in the red and silver S-10. The record is absolutely clear that that was not the defendant's car. The vehicle they knew the defendant to use was a black S-10. It turned out that, as the defendant admitted, he testified at the suppression hearing. His wife also testified. His car was in disrepair. It was in one of the sheds being fixed. The red and silver S-10 was his son's automobile.  This was the defendant's automobile, and therefore he might or would probably be in it. Also, there was no reason to stop this vehicle. You had people coming and going. There were a number of S-10 vehicles on the premises at the time. Furthermore, by the defendant's own testimony, as he was leaving and they passed the surveillance, one of the surveillance vehicles, his wife said, that looks like the feds, based on the way the vehicle looked. The defendant himself claimed that he passed very close to the vehicle, and yet he could not identify who was in the vehicle. He knew these officers very well. They'd been out of the house on a number of occasions. He couldn't identify who was in their car. How are they supposed to identify who's in his car? So there was no countervailing circumstances here to indicate that the defendant had left. You may be making an assumption it can't be made. It depends on the vision. He might not have recognized, but they could have recognized it. It depends on what his vision is and what the vision of the person in the other car. On this record, we cannot assume that they did identify him, but you can't say that. That's absolutely correct, Your Honor, and here the officers testified that they could not see who was in the car. It appears you identify this essentially as a factual question. Judge Windmill identified two possible views of the legal standard or two articulations of the legal standard and expressed some uncertainty as to what the Ninth Circuit case law pointed towards. It sounds like you really merged those and say it's all the same question. It's the application of these facts to that question, and as a result we should view the district court's determination through the clearly erroneous standard. That's absolutely correct, Your Honor. He expressed some confusion, but he clearly applied the probable cause standard. He found that they had probable cause to believe he was there at the time, and that all gets into these factual findings about it being the defendant's residence, him telling them that he could be found there, him working out of the home. They've been out there on a number of occasions before, and almost all the time he's been there. The fact that they've been out there before when his vehicle has been gone, but he has been there. They've knocked on the door before, and it's taken him a long time to come to the door, but he's in fact been at home. The fact that there were at least eight dogs present, according to his wife. They're barking. They can't hear, so they can't listen to hear if they hear any noise in the house. There are blinds and blankets and so forth, curtains over the windows. They can't see in. They did everything they could do under the circumstances. The district court's- Let me ask, just viewing these circumstances, it struck me as a somewhat unusual scenario, how stretched out this was. The number of times they'd visited him, and the fact that his potential violation had been on the table for a long, long time. They'd been out previously. He'd answered the door. Sometimes it'd taken him a while to answer, but he had, as far as I knew, always responded. And I can't tell, but it looks like the fact that he may have been vulnerable to being arrested or being charged with this offense, it seems to have been on the table for a long time as well. I think the defense has argued more in the brief than orally today, but just the fact that the defendant answered or didn't answer the door may have suggested to the officers what to do, because he had never failed to answer. Is there a reason why the officers felt it necessary to physically enter the premises? Is there a reason why the defendant should have been suspicious that on this visit, they were going to try to arrest him, so maybe he wouldn't answer the door this time when in the past he has? I don't think there was anything about this occasion, Your Honor, that would have suggested to the defendant that this time he's going to be arrested. I don't think, I'm not aware of any facts that would do that, but I am aware that there's testimony in the record that on at least one previous occasion, when they had knocked, it took him some 30 minutes to come to the door. It turned out he was inside sleeping, and then he eventually, after all that time, comes to the door. So the fact that they knock and he doesn't immediately open the door under all the circumstances here would not suggest that he's not there. Does it weigh in some fashion in favor of a course that tells the officers to wait? It's not like they were just there and dashing out. They'd been in the area for a while. They had it under observation. Is there something that kept them from waiting to see if he did answer the door in the next half hour and at that point giving them reason perhaps not to believe that he was there? Well, I think that the testimony in the record is that they were, they were, I don't know whether the defendant would believe that he's being arrested this time, but they did mention they were concerned about the dogs. They're concerned about the fact that if the defendant is in there and he's awake, he's got surveillance. There's at least one surveillance camera that he's got, and perhaps because of the way they've come this time, I know they've got the instrument that's necessary. If they have to breach the door, they have that with them. If the defendant could see through the surveillance out, there could have been indicators that this was different from some of the other more casual visits out there. Clearly, whatever instrument it was necessary to breach the door, they had it, and they had it ready. So under all the circumstances, I think the district court's factual findings were not clearly erroneous. Turning to the second issue, which was the attempt to cause Jamie Diaz, I would submit to this court that Judge Windmill here proceeded very conscientiously and very carefully and fairly in this matter. His refusal to appoint counsel ahead of trial for Jamie Diaz was clearly based on narrow legal ground. He made it clear that he couldn't think of any authority to appoint legal counsel for her. She hadn't been charged. She hadn't been arrested. She hadn't been interviewed. She hadn't invoked the fifth. None of these things had happened, and he made it clear that he simply couldn't come up with any authority to appoint counsel at public expense under those circumstances, and even asked the defense counsel to supply any authority if there was any. The defense counsel filed another pleading and basically conceded that there was no such authority under these circumstances. I get the feeling of a train wreck about to happen, though, because it's not hard to trace out the path that was eventually followed. Right. And I don't know of a specific source of authority either. On the other hand, if you see the train wreck, if you see the car and the train are going to collide at the intersection, it seems like something ought to be done before you get to the collision. Well, and I think that was a question, and I think it showed that the district court didn't simply say, no, I'm not going to do it. The district court explained, these are the only avenues of authority I can think of, and they don't apply here. If counsel knows of any, please tell the court. So the court was very conscientious, and by the time that we got to trial, I want to emphasize to this court that the procedure followed by the district court here was correct. It was very conscientious. When the issue first came up, by that time, it was during trial, by that time another attorney, Mr. Carter, had been called in to represent Jamie Diaz. The court made it clear that what it was concerned about was either side knowingly, knowingly putting a witness on the stand, knowing that they're going to invoke the Fifth. It's not something that's unexpected or accidental, but putting a witness on the stand for the purpose of having them invoke the Fifth. What the court said was for defense counsel, Mr. Veith, to go and meet with the witness and with her attorney to see if there was even going to be an issue or not. I'm looking at page 335 of the trial transcript, which is in the excerpt of the record at page 154, and he makes it clear. He says, go talk to the witness and her counsel during a recess. You can then advise the court whether it's even going to be an issue or not. And then he says, as soon as you've had a chance, this is on page 336, as soon as you've had a chance to visit with Ms. Diaz and with Mr. Carter, you can advise the court as to whether it's even going to be an issue. If it's going to be an issue, we probably need to take it up outside the presence of the jury, decide the issue, and then bring the jury in. Now, that's exactly the way the district court is supposed to proceed. Go talk to the witness and her counsel. See if this is even an issue. If it is an issue, then we'll have a hearing outside the presence of the jury and determine exactly what the witness is willing to testify to and what questions are going to provoke the judge. Let me ask you specifically about the one piece that did give me some pause when I went through this, and that was the piece where the court essentially said, you're proceeding at your peril. You may be held in contempt if suddenly out of the blue the witness asserts this right, and the jury hears the thing, but I'm trying to keep the jury from hearing. Is that a little heavy-handed or put the defense more in jeopardy than it's supposed to be put? Your Honor, not under the circumstances of this case. Looking at page 339 of the transcript, there has been a recess. Defense counsel has talked to the witness, and her attorney has come back and reported to the court the following. We would like to call Ms. Diaz. Some of the questioning I've discussed with Ms. Diaz's attorney is permissible, very limited, but some of the questioning he believes is not objectionable in that she will not take her Fifth Amendment right against self-incrimination. That said, after a short time into the questioning, he does believe that we're going to get into a situation where he does not want his client to testify. I suggest that the court or Mr. Carter invoke her Fifth Amendment right, and then the court interjects, but not in front of the jury. And then defense counsel states, I would like it in front of the jury. Defense counsel has specifically said, very quickly into the questioning, she's going to invoke the Fifth, and he wants her to do it in front of the jury. Now, the judge had already explained that the reason why you can't have that is because then the witness doesn't answer the question. There's no cross-examination on the point, and the jury is left speculating about what the witness would have said. Counsel, we all know that if a witness takes the Fifth Amendment, that can't be used by the jury in determining the guilt of that witness in this case, in the case in which the witness is on trial. But why can't the jury use that claim of the Fifth Amendment to determine the possession of the gun by someone who's not on trial? Because the invocation of the Fifth Amendment is not evidence. It's not evidence for or against. It's a witness saying, I'm not going to answer the question. It creates no inferences. Well, a common-sense deduction is the reason she's saying that is because she doesn't want to incriminate herself as to the possession of the gun. She's not on trial. So the prohibited inference is irrelevant here. Why can't the defendant use that? Is that the cleaner case? That's precisely the problem, Your Honor, is that that's what the jury is going to infer. The jury is going to infer. Isn't that a common-sense inference? It is a common-sense inference, and that's the problem. We can't allow the jury to use common sense. to cross-examine the witness on that point. It gets no ability to cross-examine the witness on that point or to impeach the witness. So it's the government's Sixth Amendment right which is being violated? Does the government have any right under the Sixth Amendment? The government does not have a Sixth Amendment right, but it does have a right under the rules of evidence to cross-examine witnesses. There's no evidence given. I'm sorry? Not if there's no evidence given. It's a circular argument, isn't it? Well, the problem is it's no evidence. There's no evidence in front of the jury, no valid evidence in front of the jury. And what they're not supposed to do is speculate, and that's exactly what they would be doing. Mr. Diaz would take the stand and say, that was my wife's gun. They put the wife on the stand and say, is that your gun? I refuse to testify because of the Fifth Amendment. Doesn't that give the jury a pretty clear view of whose gun it is? Improperly. Improperly. That's what's not supposed to happen. And it's improperly because the government doesn't have a right to cross-examine and the government doesn't have a Sixth Amendment right? The government doesn't have a Sixth Amendment right. That pertains only to the accused. But the government does have a right to cross-examine witnesses, and it is neither party's right to try a case based on inappropriate inferences and speculation like that. Let's take the alternative that occurred. Wife doesn't testify. Jury sits there and essentially hears the defendant saying, it wasn't mine, it was my wife's. No sign of the wife. And the jurors sit there and say, well, why didn't the wife say something? She was really hurt, wouldn't she have come forward and testified? And I think you have the speculation no matter what. And in this case, the defendant winds up suffering the detriment of that speculation because they assume not knowing about the wife's felony and not knowing about the potential self-incrimination if she comes in and says that's mine, they assume her failure to testify means that he's not telling the truth when he says it's not his, it's hers. Let me point out one thing here that I think is salient to this particular case. I don't think we need this because of the legal issue, but it's salient here. The testimony, in essence, came in through the defendant's son. He testified that he remembers the day when Jamie Diaz found the weapon when they were cleaning up the place. He remembers the day it was found. She found it. It was brought into the kitchen. He remembers his dad clearing the weapon to make sure that it wasn't loaded. And then he said he didn't really see it anymore. He was asked, well, did your father keep it? And he basically said, no, he didn't have any reason for any weapon. We didn't have any reason for any weapon. So the testimony came in not through her but through the son. So her testimony would have simply been adding to his. So in terms of any possible prejudice on this record, I don't think there was any. He got his defense in, and he got it in through the son. Now, but the question here is, like, there are a million things a jury could speculate about. And, of course, the juries are instructed to not speculate, to try the case on the evidence that's presented to them under the rules of evidence. But we're going from a situation from where they could speculate about something to where something is being presented on the stand introduced for the purpose of making them speculate. Now, that's going from the frying pan into the fire. That's inappropriate. That's why the courts have ruled you cannot, neither side can put a witness on the stand that they know is going to invoke the Fifth, and that's why they're putting them there. That can't be allowed. Thank you. I'm going to give you a couple minutes for rebuttal, so you've got two more minutes. Just briefly on the Klinger case, I wanted to look at that real quickly. There in the Klinger case, the witness brought in his own retained counsel. It doesn't indicate how long counsel had been retained for, but, nevertheless, the court inquired into what the testimony would be of that witness and what, if any, the evidentiary value of that testimony that was going to be presented. Here in this case, and I think there's a little bit of a difference, that there was no inquiry but simply demand that I stay away from anything in which Ms. Diaz would invoke the Fifth Amendment. So it put it back on me. Shortly thereafter, Judge Windmill ruled that she was unavailable. That's in the excerpt of record, page 156, page 334. We would argue that that was in error because it was left up to defense counsel to determine what, if anything, that Ms. Diaz would claim as privilege and to determine whether or not that was proper. That is why we brought this issue up to the court, and that's why we ask that we return back to the District Court of Idaho and get it right. Anything else, Your Honor? I appreciate your time. Thank you. Thank you. Thank both counsel for this very well-argued case.
judges: Farris, Clifton, Bea